Good morning. May it please the Court, I'm Assistant Federal Public Defender Wendy Overmeyer for Richard Ward, and I'll reserve two minutes for rebuttal. We raised a number of Fourth Amendment issues in our briefing, but this case really unravels with the first issue, which is the initial warrantless entry into Ward's home. And the critical error below is that both the exigent circumstances doctrine and the emergency aid doctrine, and if you look at both the report and recommendation and the final order, the rulings in those cases combine all three into one sentence approving of the warrantless entry. And none of the three exceptions apply in this case. The protective sweep, there was no arrest or lawful entry to trigger a protective sweep. Under the exigent circumstances doctrine, there was no probable cause, there was no risk of escape or destruction of evidence. So really the closest one that was the right one to find, the protective sweep? There is, there's both a circuit split and an intra-circuit split within this circuit as to whether you need an arrest or not. But what is clear is that you need at least a lawful entry. There is no case that I could find. What do you mean by a lawful entry? Somebody has to let you in? Yeah, a consent or some other way that you are in the house lawfully. So I could not find any case where a protective sweep was allowed. Let me just think out loud for a moment, but if there are bad people in that house, they're not going to give you lawful entry. If there's contraband in the house, you're not going to get lawful entry. If there's a shooter in the house, you're not going to get lawful entry. So what's the police to do? Well, in this case, there was no lawful entry into the house. To answer your question, I could think of maybe a domestic violence call where one person does consent and say come in and then they find a scene unsuing and make an arrest and then sweep the house or something to do with that. But doesn't the protective sweep here, it's really an adjunct to the emergency aid doctrine, isn't it? I think what the courts were trying to apply below was the emergency aid doctrine. Yes. So whether they call it one thing or another, and in some cases even exigent circumstances bleed into emergency aid, although the courts have separate exceptions. I agree that sometimes there are cases where it's called an exigency, but they really are two separate doctrines. But I think the court was trying to apply the emergency aid doctrine. So why would this not work under totality of circumstances as emergency aid where you have the shots, the person by the door, ambiguous ward not answering questions. Why wouldn't that justify this emergency aid? Well, for emergency aid, there must be an objective, reasonable belief of an actual or imminent injury inside this home. And here, a shots fired call is not per se a emergency exception. And so particularly here, the shots fired call was unverified and it was uncorroborated. But they think they're shots fired, then they think this guy has a weapon the way he's positioned himself up there by the door. And you don't have to have a certainty that somebody is in there about to be shot if reasonable belief, right? Well, if we back up a little bit, when the police before the police arrived, they were told that it was black male adults or Hispanic male adults fighting in the street that made the shots fired when they arrived. Nobody's in the street. One woman runs over and says that's them. And without asking a single question to that woman, we don't know if she was the 911 caller. We don't know what she was referring to with that because she was never talked to. They go over, this one officer goes over to this house and takes two white men down to the ground who were just standing in their, one standing in the yard, one standing in the car. Now, this officer stated it was his subjective belief that he assumed the person in the doorway, who was just standing in the doorway, had a weapon from the way his hands were positioned. But he did not, in fact, see a weapon. And there have been cases where officers have seen someone with a weapon and they ignore police commands and go in the doorway. And that was not found to be an emergency. If I remember correctly, they also instructed him to stop and I think they instructed him to go down on the ground, but he ignored the commands and went into the house. That's a little unclear from the record. McKenzie is the only to whether he gave commands to Ward and Howard, the people outside the home, or whether that also included Deering. When he was questioned on Cross on this, he said, you know, I don't know. You're the attorneys. Figure this out. Do police have an obligation, actually, in a case like this where the information is that shots are fired and in the case of Deering, ignoring the commands to ensure that somebody isn't, in fact, shot and in the house and injured. In other words, isn't it their responsibility to provide emergency aid to someone who may be injured? Well, police do have a caretaking function and that's where the emergency aid doctrine comes from. And certainly a shots fired call is concerning, but here the police did not do any corroboration or verification of that call to link it to these suspects or to this house in particular. And also the police waited 18 minutes from when they first arrived on the scene to when they ordered the sweep. And so that 18 minute span, it's, well, maybe there was time to get a warrant, a telephonic warrant. There was time to ask the woman who said... Miss Obermeyer, you said there was no corroborative evidence that there was a shooting there? Correct. What about the spent shells in the doorway? Those were not seen until after the sweep was ordered and there were a number of shells in the yard, which we don't know how long those shells had been there. Obviously, some shells had been fired at some time. If you hear a report that there's some shooting and you see some shells, can't you put one together with the other on the issue of reasonable suspicion? Well, I don't know that the officers had that information when he made the decision to order the sweep. He did not know that the shells were at the house, but... Weren't the shells outdoors before you go into the door on the stoop? Again, there's no report of an injury. There's no sounds coming from the house. Could you answer my question? What was the location of the shells? The shells were outside the house. Yes, the shells were outside the house near the door. And they had a report of a shooting. And that, you say, is not reasonable suspicion that there was a recent shooting there at that location? I don't... As a reasonable suspicion of the crime? Yes. Possibly. Possibly, but it doesn't necessarily correlate that there is someone actually injured in the home here. Do you want to reserve your remaining time? Oh, yes. I would like to reserve my remaining time. Good morning, Your Honors. Nancy Olsen appearing on behalf of the government. May it please the Court, the main question in this case, as Ward's attorney noted, is whether that initial entry was objectively reasonable, and that's under the totality of the circumstances, whether these officers reasonably believed that emergency existed. And I think Judge McEwen has already recognized several of the facts that pointed to such a reasonable belief of an emergency, including the emergency 911 calls. There were two shots fired, unlawful use of a firearm. We have Deering, who was standing by the door, ignoring commands. Now, Ward contends on appeal that there's some ambiguity in the record on that, but notably, the magistrate judge and then adopted by the district court resolved that ambiguity. There were findings of fact that Deering was ignoring commands, and so that question has already been resolved, and there's nothing in the record to suggest that it was clear error. In fact, McKenzie's testimony on that point fully supports the Court's finding that, in fact, Deering was ignoring commands. McKenzie also testified that he believed that the way that Deering was standing before he pivoted into the house was consistent with a person who would hold a gun in a firearm-ready position. And it's not his subjective belief that matters, but what matters is whether or not an objectively reasonable officer who has that information about what a firearms-ready position is and how you hold a gun when you're at the range. So long as that's an objectively reasonable belief, then that contributes to the totality of the circumstances as well. We do have quite extensive findings here by the magistrate judge that were adopted by Judge George. So I don't know if any of the actual, I don't know that there's actually any challenge to the factual findings. Is there? It sounds like that Ward is continuing to find out. The Court did find that he was, and I think that the record supports that. If you look at pages 464, 465, 515 to 516 and 552, those are all the places where McKenzie's talking about this. He was asked about it multiple times, and I think he did his best to make it clear. But again, he's talking about this unfolding situation. He's initially the only officer on the scene, and so he's trying to control three subjects for a few moments by himself until he gets back up. And he's yelling at all three of them, and then one of them ignores his commands. As to the point about the spent shell casings that were littered all over the front yard, those were seen by McKenzie before they made entry into the home. This is at 472 and also 552 of the record. There was an argument made regarding the response time when the officers were all on scene, and then how long it took them to decide to go in the house. But this is an internally inconsistent argument. Ward cannot have it both ways, because on the one hand, he said you should have spent more time, you should have asked more questions, you should have gotten more names and corroborated more pieces of information. But then now he's complaining that 18 minutes is too long and the officers apparently should have just run in. And so we think, given all of the facts in the record, there was an objectively reasonable basis that these officers should go in. McKenzie testified, he said, it was my duty as an officer. I have to make sure that no one is in their herd. And because we start with the shots fired, we move into varying levels of compliance with the suspects, the person darting into the house, they think he has a gun, and really just a rapid situation where the officer, I think, reasonably believed that he needed to make sure that there wasn't a dangerous situation there. Why isn't it significant, as Ms. Olson points out, that one of the 9-11 calls discussed black and Hispanic individuals, but Ward, the chief of McKenzie, when he arrived on the scene, there was certain information given by 9-11, and then when he got there, basically none of it was there. And so he's now working with a little bit more of a blank slate to figure out what's going on. And what I mean by that is, there's two examples. One is the race that you mentioned. So the 9-11 reports, there's a fight breaking out, there's a group, and there are these people of particular races. And so when he gets there, there's no more group that's gathered, that's set to fight, and there's also no more group that's by the house, that has the bounce house in front of it. So both of those groups have dispersed, and he's kind of now, he knows that there have been shots fired, he knows that there's a potential emergency, but he now kind of has to piece together from what he can see on scene. And then the second point about the 9-11 calls is he was given information about house numbers and ways to identify the relevant house involved. And that information was also internally inconsistent, because if he's saying, if he's told, okay, to the right of 4601, and if you look at that, that's at the back of the cul-de-sac, and it would be to the right. But it said, it has a bounce house in front of it. The problem with that is, the bounce house house was at the opening of the cul-de-sac. So they're actually kind of at two different ends. And so now he gets there, and he has some 9-11 information. Some of it he testified he remembered the details on. He actually testified he didn't recall the races, but in any event, let's say that he had or he should have, once he gets there, there's no individuals really to speak of, except for he has this woman rushing out to him and saying, that's them, there they are. And so when you have two 9-11 calls, you have someone who looks like they're waiting for you on scene and comes to tell you that's them, you're going to react with your gun because you are concerned that that's them means that's where the gun is, right over there. And so taking all of those things into account, McKenzie reacted reasonably when he arrived on that scene, especially given the changing circumstances as they were. I'll just note, as Judge McEwen already acknowledged, the officers didn't need to have a certainty of an emergency. Again, this goes to reasonableness. The Supreme Court has said it over and over, most recently I think in Brigham City. And so that's really the test here. I think that with those arguments, I've responded so far to all of the discussion regarding the initial entry. And unless the Court has any more questions about that, or if the Court would like to discuss the Franks issue at all, otherwise I will submit on the briefs. Thank you. Thank you. Governor March said one clarification. And going back to your brief, it appeared that you didn't challenge the factual findings, but instead challenged whether taken together, the collection of findings provide an objective exigent circumstance situation. Am I correct in that? That's correct. Yes. The facts are pretty much agreed upon as to what happened when McKenzie arrived, with a little exception as to whether he commanded Deering or not. But again, these officers waited 18 minutes, 18 minutes to go into a house where if they truly believed someone was actually shot and fatally injured, 18 minutes is a really long period of time where it just doesn't match up with their reasons that they later claim for going into the house. And so in these 18 minutes, the house numbers, they don't match. The race of the suspects don't match. The bounce house was on the opposite side of the street from Ward's house. He simply went to the only people that were outside, with no officer, went back to this woman. We still don't know who this woman is and what she saw and where these shots fired occurred. We have no idea if that was Ward's house or not. And so that is not enough for the government to meet its very heavy burden. That's what the Supreme Court has said. It's a very heavy burden for the government to establish an exception to the warrant requirement when entering a home. And so if permitted to stand here, the ruling below really blurs the line between these exceptions. And when you look at the totality, the emergency is just not there. And it's not reflected by the amount of time that police officers waited to go into the house, 18 minutes, and they took 20 minutes to complete the sweep, leaving a door locked upstairs where someone could have been injured inside that door. So it just does not reflect an emergency situation. And this Court has ruled so in the past in numerous cases. So Ward rests on the briefs as to the other Fourth Amendment issues and asks this Court to reverse the suppression denial and vacate the conviction, or in the alternative, grant a Franks hearing. Thank you. Thank you very much. Thank you. United States v. Ward is submitted. Looks like it's Nevada Day here at the Ninth Circuit in terms of criminal arguments. The next case for argument is California v. Ipe Nation of Santa Isabel.
judges: Fuentes, McKeown, Bea